# In the United States Court of Federal Claims

No. 14–1228C

(Filed: November 8, 2016)

| | |
|---|---|
| GUSC ENERGY, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Grants Made Under the American Recovery and Reinvestment Act of 2009, Section 1603; Cogeneration Plants; Cost-Basis Allocation; Recapture |

*Timothy L. Jacobs*, with whom was *Hilary B. Lefko*, Hunton & Williams, LLP, Washington, D.C., for Plaintiff.

*Jennifer D. Auchterlonie* and *Jason S. Selmont*, Trial Attorneys, with whom were *Caroline D. Ciraolo*, Principal Deputy Assistant Attorney General, *David I. Pincus*, Chief, and *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

Plaintiff GUSC Energy, Inc. ("GUSC Energy") is the owner and operator of an open-loop biomass facility (the "Biomass Plant"). It brought this action on December 22, 2014, alleging that the Government underpaid it by more than five million dollars when it issued a grant to GUSC Energy under Section 1603 of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 ("ARRA"). Section 1603 allows certain owners of renewable energy facilities to apply for cash grants. Owners of open-loop biomass facilities like GUSC Energy became entitled to cash grants equal to thirty percent of the facilities' cost basis. Id. § 1603(b)(1)–(2)(A). The Government responded to GUSC Energy's claims by filing a counterclaim for recapture of the entire

awarded grant, alleging that GUSC Energy has permanently ceased electricity production at the Biomass Plant.

The Court held a two-day trial in this case on June 21–22, 2016. During that trial, the Court heard the testimony of four witnesses. GUSC Energy's two fact witnesses were Daniel Maneen and Christopher Lindsey, and its expert witness was Michael Oswald. The Government's expert witness was Trent Markell.

At trial and in the post-trial briefing, it became clear that the parties primarily disagree on the allocation the Government is required to perform between qualifying and non-qualifying activities in this case. The parties agree that the Biomass Plant is a qualified facility, and that all of the property in the plant is qualified property for the purposes of Section 1603. However, the steam used to generate electricity from the biomass in the plant is also used to heat the business and technology park in which the plant is located. Therefore, under this Court's holding in W.E. Partners II, LLC v. United States, 119 Fed. Cl. 684 (2015), aff'd without published opinion, 636 F. App'x 796 (Fed. Cir. 2016), GUSC Energy was required to present its version of a reasonable cost basis allocation between the Biomass Plant's qualifying electricity generation and the non-qualifying heating activities. Instead, GUSC Energy argues that no such allocation is necessary because all of the qualified property in the Biomass Plant is used to generate electricity. The Court rejected this argument in W.E. Partners, and it rejects it again here.

GUSC Energy did not present a competing activity-based allocation at trial, but the testimony of the Government's own expert undermined the Government's allocation. Therefore, the Court finds that some damages are appropriate, and should be calculated using Mr. Markell's activity-based allocation method. The Court also finds that GUSC Energy has not permanently ceased production of electricity at the Biomass Plant, so the Government's counterclaim for recapture is dismissed.

## Findings of Fact

### A. The Griffiss Business and Technology Park

The Biomass Plant is located in the Griffiss Business and Technology Park (the "Park"). Stip. ¶ 5.[1] The Park is located in Rome, New York, on the site of the former Griffiss Air Force Base. Id. When the base closed for all military purposes in 1995, the closure was a major blow to the city of Rome. Stip. ¶ 6; Maneen, Tr. 38–40. Griffiss Local Development Corporation ("GLDC") was formed in 1995 as a not-for-profit corporation in order to transform the Base into the Park. Stip. ¶ 7; Maneen, Tr. 41. GLDC became the successor to the U.S. Department of Defense as the owner and operator of the Base. Stip. ¶ 7. The Base included (1) an electric distribution system with approximately 300 miles

[1] References to "Stip. ¶ _" refer to the parties' Joint Stipulations of Fact, filed June 2, 2016 (Dkt. No. 39).

of overhead and underground electrical wires, transformers, and other equipment, (2) a 26-mile steam distribution system, and (3) a pre-existing steam production plant. Stip. ¶ 8; Maneen, Tr. 41.

GLDC became the Park's steam heat provider in September 1999. Stip. ¶ 9. In May 2002, GLDC also began to own and operate the Park's electricity facilities and to provide electricity to the park's tenants. Id. The Park currently is home to more than 60 private companies and governmental entities, and over 5,600 employees. Stip. ¶ 10. In 2000, GLDC transferred to Griffiss Utility Service Corp. ("Griffis Utility") ownership and operational responsibility for the electric distribution system, the steam distribution system, and the steam plant. Stip. ¶ 13. Griffiss Utility now is regulated by the New York State Public Service Commission as an electric corporation and a steam corporation. Stip. ¶ 13. It is authorized to provide retail electric and steam service to tenants within the Park. Id. As such, Griffiss Utility is the "provider of last resort"—the default provider for the Park tenants—and must provide electricity and steam service to those tenants that desire one or both services. Id.; Maneen, Tr. 50–51. Customers may purchase electricity from outside the Park if Griffiss Utility's rates are not competitive, but Griffiss Utility has been able to keep its electricity rates low in order to avoid customer attrition. Maneen, Tr. 51.

Griffiss Utility is not an electricity producer. Stip. ¶ 14. Rather, it traditionally has purchased the electricity that it distributes to Park customers (e.g., from the wholesale market). Id. Griffiss Utility uses both the Biomass Plant and outside sources to satisfy its customers' electricity needs. Maneen, Tr. 53–54. The base electricity load of the Park is approximately eight megawatts ("MW") and the peak load is approximately fourteen MW. Stip. ¶ 14.

B. The Biomass Plant

In approximately 2011, Griffiss Utility decided to construct an open-loop biomass facility to be a combined heat and power plant, Stip. ¶ 16, generating steam to meet the Park's steam heat needs and electricity to offset in small part the electricity that it previously had been purchasing. Stip. ¶¶ 22e, 23. Griffiss Utility formed GUSC Energy for the purpose of owning and operating the Biomass Plant, and to operate the preexisting steam plant. Stip. ¶ 16. GUSC Energy sells the steam and electricity generated from the biomass facility to Griffiss Utility, which in turn sells the steam heat and electricity to the Park tenants. Stip. ¶¶ 23, 24, 25. GUSC Energy also operates the preexisting steam plant's natural gas boilers on behalf of Griffiss Utility, and Griffiss Utility sells this steam to Park tenants. Stip. ¶¶ 24–25.

GUSC Energy constructed the Biomass Plant next to the preexisting steam plant. A biomass boiler burns biomass—here, wood chips—as its fuel source to produce steam. Stip. ¶ 26. This steam can then be used to generate electricity by running the steam through a steam turbine and generator system ("STG"). Stip. ¶¶ 22c, 22e.

The Biomass Plant is a cogeneration plant. A cogeneration plant (also known as a combined heat and power plant) provides steam for both industrial processes (like steam heating) and power generation. DX 20 at 4. Steam generated by its boiler system first is used to power its turbine, and then is piped into the Park's district heating system. Id. at 21. The Biomass Plant contains the following relevant components: (1) a biomass-fueled, field-erected boiler, designed to produce 40,000 pounds of steam per hour, and (2) a back-pressure STG with a full load electrical output of 885 kilowatts ("kW"). Stip. ¶¶ 22b, 22c; PX 28 at GEN000561. In actual operation, during the 2013–2014 heating season, the facility provided for approximately 2.8 percent of the overall electrical needs of the Park, and it provided for 46.7 percent of the overall steam heat needs of the Park. Markell, Tr. 304.

In addition to the Biomass Plant, GUSC Energy retained its preexisting steam plant's natural gas-fired boilers. Stip. ¶ 24. Retaining these boilers allowed GUSC Energy to meet the Park's peak steam demands, to add redundancy if the biomass boiler was non-functional, and to have options as to which facility to use depending on comparative fuel prices. Id.; Maneen, Tr. 401–06, 408–09. Additionally, neither Griffiss Utility nor GUSC Energy operated the Biomass Plant during the summer months when the Business Park did not need steam heat. Maneen, Tr. 408.

The Government concedes that all of the property costs GUSC Energy included in its grant application relate to property that is integral to the production of electricity at the Biomass Plant. See Def. Post-Trial Br. at 23, Dkt. No. 47 (Aug. 17, 2016); Second Supp. Stip. of Fact, Dkt. No. 56 (filed Sept. 29, 2016). The weight of the evidence further confirms this conclusion—the Biomass Plant did not contain property that could only be used for generating steam for heating purposes.

    C.  Operating and Idling the Biomass Plant

The Biomass Plant only operated continuously during the 2013–2014 heating season, from November 2013 to May 2014. See Stip. ¶ 37; Markell, Tr. 303–04. GUSC Energy idled the facility in May 2014 for the summer, and decided in the fall of 2014 not to restart operations. Stip. ¶ 37. GUSC Energy decided not to restart the Biomass Plant because natural gas prices had fallen so low that operating the plant was not economical. Id.; Maneen Tr. 407. The plant briefly operated in April 2016, but otherwise has remained idle. Stip. ¶ 42. Testimony at trial showed that GUSC Energy has maintained the Biomass Plant in good working order for the entire time the plant has been idle. Maneen, Tr. 424–27. The Government seeks to recapture the Section 1603 grant it paid to GUSC Energy, claiming that the extended idling of the Biomass Plant is really a permanent cessation of electricity production at the plant.

D. <u>GUSC Energy's Section 1603 Grant Application</u>

GUSC Energy submitted its final Section 1603 application and supporting documentation to the Treasury on or about March 6, 2014. Stip. ¶ 27. GUSC Energy stated that its qualified cost basis was $18,230,094, and therefore its requested payment was $5,469,028 (30 percent of its claimed basis). Stip. ¶¶ 32, 33. With its application, GUSC Energy submitted an independent accountant report that opined its cost basis was fairly stated. Stip. ¶ 32. In additional communications, GUSC Energy confirmed that "approximately 6.6 percent of the total steam energy available for end-use is converted to electricity." DX 4 at 333–34; <u>see</u> Lindsey, Tr. at 172. Therefore, the Treasury reduced GUSC Energy's eligible cost basis to 6.6 percent of the claimed cost basis submitted on the application, and on June 26, 2014, awarded a grant equal to $316,609 (30 percent of the eligible basis, minus a 7.2 percent deduction for sequestration). Stip. ¶ 34.

At trial, the Government's expert, Mr. Markell, took issue with the Government's analysis. Mr. Markell instead proposed a method (the "efficiency method") that allocates between qualifying and nonqualifying activities by focusing on the energy used for electricity generation, and compares that generation efficiency to the efficiency of a hypothetical electricity-only biomass plant. DX 20 at 33; Markell, Tr. 316–18. Specifically, Mr. Markell examined the actual heat input of plaintiff's facility (66,602,690 Btu/hr), and divided that number by the heat rate of a typical biomass facility that produces only electricity (13,500 Btu/kWh). DX 20 at 33. Mr. Markell found that GUSC Energy's heat input could generate 4,934 kW of electricity. <u>Id.</u> During the period when the Biomass Plant was operational, it actually generated only 752.1 kW. Therefore, according to Mr. Markell, GUSC Energy's facility generates only 15.24 percent of the electricity it would generate if it only generated electricity. So, under Mr. Markell's analysis, 15.24 percent, rather than 6.6 percent, of GUSC Energy's claimed costs should have been counted as eligible cost basis.

In contrast, Plaintiff's expert Mr. Oswald argued that all costs GUSC Energy incurred should be treated as qualifying, reasoning that all of the equipment GUSC Energy used was necessary for electricity generation. PX 178 at 14–15, 17. Mr. Oswald testified that no other engineering basis existed to allocate costs between qualifying and nonqualifying activities. Oswald, Tr. 210.

Further, GUSC Energy and the Government disagreed at trial on whether certain costs could be included in GUSC Energy's eligible cost basis. Specifically, the parties did not agree on whether total costs of $65,938 associated with "iron works," site clean-up, paving, and landscaping were eligible. <u>See</u> Second Supp. Stip. of Fact, Dkt. No. 56 (filed Sept. 29, 2016). The parties now agree that these costs are properly includable in Plaintiff's eligible cost basis. <u>Id.</u> GUSC Energy seeks reimbursement of the difference between its claimed cash grant and the grant it actually received.

## Discussion

### A. GUSC Energy is Entitled to Damages Based on a Reasonable Activity-Based Allocation

In W.E. Partners, this Court set out a three-step inquiry that applies when a court analyzes whether a Section 1603 grant should be awarded to the owner of an open-loop biomass facility: (1) the facility must be a "qualified facility," (2) the property costs the plaintiff claims as its cost basis in the facility must relate to "qualified property," and (3) the cost basis claimed for qualified property must relate to a "qualifying activity." See 119 Fed. Cl. at 692, 694. The Court will address each step in turn.

#### 1. The Biomass Plant is a Qualified Facility

First, the facility must be a "qualified facility" under ARRA Section 1603. Open-loop biomass facilities are one type of "qualified facility" that constitutes specified energy property under Section 1603, see ARRA § 1603(a), 26 U.S.C. 45(d)(3) (2012), and the parties do not dispute that the Biomass Plant at issue in this case is an open-loop biomass facility. Therefore, the Biomass Plant is a qualified facility.

#### 2. All of GUSC Energy's Claimed Costs Relate to Qualified Property

Second, the cost basis GUSC Energy claims in the qualified facility must relate only to "qualified property." Section 1603 incorporates the definitions in Section 48 of the Internal Revenue Code ("IRC"), see § 1603(h), which defines "qualified property" as "tangible property . . . used as an integral part" of grant-eligible facilities. 26 U.S.C. § 48(a)(5)(D) (2012). Treasury Guidance for the Section 1603 program excludes as qualified property "electrical transmission equipment, such as transmission lines and towers, or any equipment beyond the electrical transmission stage, such as transformers and distribution lines." Treasury Guidance at 12.[2] Here, the parties now agree that all property for which GUSC Energy claims a grant is qualified property because it is integral to electricity generation. Still, as noted above, the Government's original grant did not take into account $65,938 in eligible costs associated with "iron works," site clean-up, paving, and landscaping, which the parties now agree are eligible costs that relate to qualified property. Thus, to calculate damages, GUSC Energy's qualified property costs must be revised upward in an amount equal to these stipulated costs.

---

[2] References to "Treasury Guidance" refer to U.S. Treasury Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009 (Rev'd Apr. 2011), available at https://www.treasury.gov/initiatives/recovery/Documents/GUIDANCE.pdf. The Guidance "is entitled to considerable weight as a reasonable interpretation" of Section 1603. W.E. Partners, 119 Fed. Cl. at 692.

3. GUSC Energy has not Presented an Activity-Based Allocation Method, but the Government's Allocation Method Also Fails

The third step is where GUSC Energy hits a snag. Apparently disagreeing with the W.E. Partners analysis, it argues that all costs associated with qualified property must be includable as eligible cost basis for the purposes of a Section 1603 grant. As a result, GUSC Energy presents no activity-based allocation, but rather only a property-based one. The Court rejected this argument in W.E. Partners. In that case, the Court similarly found that all property costs the plaintiff had claimed as eligible cost basis related to qualified property. 119 Fed. Cl. at 693. This finding did not prevent the Court from concluding that "the eligible cost basis of qualifying property must be reasonably allocated between the non-qualifying chicken rendering processes and the qualifying electricity generation." Id. at 694. The Treasury found that the steam from one of the three boilers at issue in that case was necessary to produce the amount of electricity that the turbine produced, so only the costs associated with one of the three boilers was includable in the plaintiff's eligible cost basis. Id.

GUSC Energy argues that this case is different from W.E. Partners because there is only one boiler at the Biomass Plant, so all the steam that boiler generates is necessary for electricity production. Mr. Oswald testified that this approach made sense from an engineering perspective. Still, this approach misses the activity-based nature of the W.E. Partners allocation scheme. In W.E. Partners, the Treasury determined that only one boiler was necessary to produce the electricity, but the Court merely examined whether the Treasury's determination reasonably allocated qualified property costs associated with eligible and ineligible *activities*. The Court's analysis means that the result would have been the same had there been only one large boiler that supplied steam to generate electricity, with the exhaust steam going to the chicken rendering processes.

In effect, that is the situation in this case. Just as in W.E. Partners, the Biomass Plant here was designed as a cogeneration plant. While the steam from the plant's single boiler powers the turbine, the steam is predominantly significant for its role in the Park's district heating system. The Biomass Plant supplied 46.7 percent of the Park's steam heating needs when it was operational, but supplied only 2.8 percent of the Park's electricity. Furthermore, the Park does not operate during the summer months because its cogeneration design means it cannot operate when GUSC Energy's customers do not require steam heat. These factors mean that costs associated with the Biomass Plant's qualified property must be allocated between that property's roles in electricity generation and thermal heat generation.

GUSC Energy did not present an activity-based allocation at trial. On the other hand, the Government's activity-based allocation, which it used in making its grant award, also lacks merit. Mr. Markell, the Government's own expert, testified that the Government's allocation method unrealistically assumes a perfect conversion of energy in

the electricity generation process. DX 20 at 32; Markell, Tr. 314–15. Mr. Markell instead applied an approach that focuses on the energy used to generate electricity. His approach compares the generation efficiency to that of a typical biomass plant producing only electricity. Mr. Markell's efficiency method would allow GUSC Energy to claim 15.24 percent of its costs as eligible cost basis. This result means that while GUSC Energy presented no activity-based allocation method at trial, the Government likewise could not support its position. Therefore, the Court finds it appropriate to award damages, but only to the extent that these damages are supported by Mr. Markell's efficiency method.

GUSC Energy protests that this result discourages the construction of cogeneration plants, citing several sources that recommend cogeneration in biomass plants and the expenses associated with non-cogeneration plants. This policy argument is not convincing. In passing Section 1603, Congress created 30 percent grants to subsidize electricity production, not steam heat production. In effect, cogeneration allows the owner of a biomass plant to further "subsidize" the production of electricity by taking in additional revenue from steam heat customers, so a lower Government subsidy in such instances is appropriate from a policy perspective. Indeed, in W.E. Partners, this Court approved an activity-based allocation scheme because it recognized the added benefits a biomass plant owner could receive from steam heat use. The Court sees no reason to depart from this methodology here.

4. GUSC Energy is Entitled to Damages

In sum, the Court awards GUSC Energy damages using Mr. Markell's "efficiency" allocation method. The eligible net costs relating to qualified property, as stipulated by the parties, are $18,230,094 (this figure includes the stipulated $65,938 in iron works, landscaping, paving, and site clean-up costs). Mr. Markell found that 15.24 percent of these costs related to a qualifying activity. Therefore, GUSC Energy's eligible cost basis for a Section 1603 grant is $2,778,266. Grants under Section 1603 are calculated by taking 30 percent of this eligible cost basis, which is $833,480.

This grant award also would have been reduced under sequestration. Sequestration is the name given to a series of discretionary spending cuts made under the Budget Control Act of 2011, Pub. L. 112-25, 125 Stat. 240. While the Government does not argue the point in its post-trial briefing, Section 1603 grants were subject to a 7.2 percent reduction for sequestration during the time period in which GUSC Energy received its grant. See IRS Notice 2014-39, 2014-26 I.R.B. 1109 (June 11, 2014) ("[A] Section 1603 Award made to a Section 1603 applicant on or after October 1, 2013, and on or before September 30, 2014, is subject to a sequestration rate of 7.2 percent, irrespective of when the application was received by Treasury."). GUSC Energy received its award letter on June 26, 2014, so its award was subject to a 7.2 percent sequestration reduction. Indeed, the Government's original grant took this reduction into account. See Stip. ¶ 34.

GUSC Energy argues that a sequestration reduction is not appropriate because this is a *de novo* proceeding, and judgments of this Court are not subject to sequestration. See Pl. Post-Trial Response Br. at 60, Dkt. No. 53 (filed Sept. 6, 2016). This argument misses the mark. Allowing GUSC Energy to claim damages in the amount of a Section 1603 award without a sequestration reduction essentially would turn this Court into a backdoor maneuver around sequestration. The point of damages in these cases is to place plaintiffs in the position they would have been in had the Treasury awarded correct grants under Section 1603. Here, the Treasury's award would have been reduced under sequestration, so the Court's award must take the sequestration reduction into account. Therefore, the grant GUSC Energy should have received was $773,469 ($833,480 minus a 7.2 percent sequestration reduction of $60,011). The Court awards GUSC Energy damages equal to the difference between this amount and Treasury's $316,609 award, which is $456,860.

B. GUSC Energy has not Permanently Ceased Production at the Biomass Plant

A Section 1603 grant is subject to recapture by the Government if the specified energy property use on which the grant was predicated "changes so that [the property] no longer qualifies as specified energy property." Treasury Guidance at 19. One such change is a "permanent cessation of production" at the energy facility. Id. The Government argues that the extended idling of the Biomass Plant is, in reality, a permanent cessation of production. If one can idle a plant with only general plans to restart operations at some point, the Government reasons, owners of biomass plants could keep their grants while idling their facilities indefinitely. Therefore, the Government proposes a strict intent standard that would find a permanent cessation of production whenever a facility owner idled its plant without the intent to restart operations at the plant at a specific time.

The Court finds that the Government's proposed intent requirement is too stringent. The Treasury Guidance does not support the Government's interpretation. The Guidance notes that "[t]emporary cessation of energy production will not result in recapture provided the owner of the property intends to resume production at the time production ceases." Id. The Guidance does not attach a specific date or time requirement to the "intent to resume production" requirement. Therefore, a better approach would require evidence of an affirmative intent to permanently cease production at the energy facility before allowing recapture. There is no such evidence here, as GUSC Energy has maintained the Biomass Plant in good working order for the entire time the plant has been idle. Reasonable business persons do not generally construct multimillion-dollar energy facilities, idle them, and then maintain them in good working order, never to use them again. Therefore, the Court finds that GUSC Energy has not permanently ceased production at the Biomass Plant, and the Government's counterclaim for recapture is dismissed.

Conclusion

The Clerk is directed to enter final judgment for Plaintiff and against the Government in the amount of $456,860. No costs.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge